**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Raymond Bouderau,<br><br>        Plaintiff,<br><br>                -against-<br><br>Duncan McCarthy,<br><br>        Defendant. | Civil Action No. 20-cv-4384<br><br><br>**COMPLAINT**<br><br><br>**ECF Case** |

Plaintiff Raymond Bouderau, by his attorney Raymond J. Markovich, Esq., hereby brings this Complaint and alleges as follows:

## PARTIES IN THIS COMPLAINT

1.      Plaintiff Raymond Bouderau ("Plaintiff") is an individual domiciled in New York County, State of New York.

2.      Defendant Duncan McCarthy ("Defendant") is an individual domiciled in Orange County, State of New York

## JURISDICTION AND VENUE

3.      The claims asserted herein arise under and pursuant to §10(b) of the Exchange Act of 1934 (15 U.S.C. §78j(b) and/or 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5). This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act. The Court has supplemental jurisdiction over all other claims pursuant to 28 U.S.C. §1367 as the other claims are so related to claims within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

4.      This Court has personal jurisdiction over Defendant. Defendant does business or maintains a regular place of business in this district. Venue is proper in this district pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as this is this district in which a substantial part of the events or omissions giving rise to the claim occurred.

5.      In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the United States mail and interstate telephone communications.

## FACTS

6.      Defendant solicited Plaintiff to invest money into the initial capital and/or further capital of the company Beyond Steel, Inc. ("Company") as memorialized in an investment contract entitled "Memorandum of Understanding Agreement of and Between the Shareholders of Beyond Steel, Inc. & Raymond Bouderau" dated November 19, 2019 ("Investment Contract"). A true and correct copy of such Investment Contract is attached hereto and incorporated herein as Exhibit A. [Ex. A].

7.      Prior to the formation of the Company, Defendant had been an employee of Plaintiff's company J-Bar Reinforcement Inc. which was engaged in the "rebar" business.

8.      The Investment Contract required Plaintiff (a) to invest his money (b) in the Company (c) for an expectation of profits to be derived solely from the efforts of individuals other than Plaintiff. [Ex. A].

9.      Plaintiff did invest $200,000 into the Company for an expectation that he would receive payment from the Company of his $200,000 plus a 20% premium ($40,000) in a first priority position and then 40% of all net profits generated by the Company thereafter as specified in the Investment Contract ("Securities"). [Ex. A, p. 1.]

10.     As part of Defendant's solicitation of Plaintiff, and prior to the parties executing the Investment Contract, Defendant had represented to Plaintiff that Defendant would be actively participating in the business of the Company, would remain a shareholder of the Company and would not compete with the Company ("Representations"). The Representations concerned material facts.

11.     As the Company's "rebar" business in southern New York State and specifically in Orange County and adjacent counties is highly competitive, Plaintiff reasonably relied upon the Representations.

12.     In the Investment Contract, Defendant subsequently agreed that "for a period of five years following the termination of Shareholder's [Defendant's] interest in the Company or termination of this agreement, shareholders shall not, directly or indirectly, either as a principal, agent, employee, employer, consultant, partner, member or manager of a limited liability company or, shareholder of a company, engage or otherwise participate in any manner or fashion in any business that is in competition in any manner whatsoever with the business activities of the Company, in or around any market in which the Company has, or has publicly announced a plan for doing business." The foregoing shall be referred to as the non-compete clause ("Non-Compete"). [Ex. A, p. 1-2].

13.     Defendant was a corporate fiduciary of the Company as evidenced in the Shareholder Agreement for the Company ("Shareholder Agreement") and Plaintiff was and is an intended beneficiary under the Shareholder Agreement. A true and correct copy of the Shareholder Agreement for the Company is attached hereto and incorporated herein as Exhibit B. [Ex. B].

14.     On or about February 12, 2020, Plaintiff had reason to believe that something was wrong with the Company and had his counsel send a demand letter by email to Defendant ("Demand Letter"). A true and correct copy of such Demand Letter is attached hereto and incorporated herein as Exhibit C. [Ex. C.]

15.     On February 26, 2020, counsel for Defendant responded by email feigning ignorance as to the nature of the Investment Contract but stated that "the noncompete section is, as you must know, completely unenforceable" ("Response"). A true and correct copy of the Response is attached hereto and incorporated herein as Exhibit D. [Ex. D].

16.     Counsel for Defendant then proceeded to threaten to pursue claims against Plaintiff if Plaintiff pursued his own claims against Defendant. [Ex. D, p. 1].

17.     Much to Plaintiff's surprise, on or about February 28, 2020, Plaintiff received from Defendant a purported amendment or release concerning the Investment Contract signed by Defendant before a notary ("Release").

18.     Plaintiff did not execute the Release.

19.     On or about February 2020, Sean Aronsen ("Aronsen") made Defendant a partner and/or hired Defendant as an employee and/or executive in his competing "rebar" business in southern New York State and specifically in Orange County and adjacent counties ("Competing Business").

20.     The Competing Business operates within 50 miles of Company's operations.

21.     Upon information and belief, on or about February 2020, the Competing Business obtained a very large contract for approximately 15,000 tons of "rebar" ("Rebar Job").

22.     Upon information and belief, Defendant had diverted, or helped divert, the Rebar Job, an asset of Company, to the Competing Business. The Rebar Job could generate as much as $6,000,000 in net profits for the Competing Business.

23.     Prior to the formation of the Competing Business, Aronsen had been an employee of Plaintiff's company J-Bar Reinforcement Inc. which was engaged in the "rebar" business.

## CLAIMS

24.     Each of the following claims is asserted together and in the alternative.

**CLAIM 1 - Violations of Section 10(b) of the Exchange Act and Rule 10b-5**

25.     Plaintiff incorporates by reference the allegations of paragraphs 1 through 24 inclusive, as though fully set forth herein.

26.     Defendant engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which he knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff; made various untrue statements of material facts and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and did: (i) deceive the Plaintiff as alleged herein; and (ii) caused Plaintiff to purchase or otherwise acquire securities of little or no value. In furtherance of this unlawful scheme, plan and course of conduct, Defendant took the actions set forth herein.

27.     Defendant made Representations.

28.     Defendant executed an Investment Contract that contains a Non-Compete.

29.     Plaintiff reasonably relied upon the Representations and the representations in the Non-Compete in the Investment Contract and Plaintiff invested $200,000 into the Company in return for Securities. [Ex. A].

30.     On or about February 28, 2020, Plaintiff received from Defendant the Release.

31.     Plaintiff did not execute the Release.

32.     On or about February 2020, Aronsen made Defendant a partner and/or hired Defendant as an employee and/or executive in his Competing Business.

33.     The Competing Business operates within 50 miles of Company's operations in violation of the Non-Compete.

34.     The Representations were false.

35.     At the time of executing the Investment Contract, Defendant did not intend to honor the Non-Compete and did not subsequently honor the Non-Compete, so the representations contained in the Non-Compete were false. [Ex. A, p. 1-2].

36.     The February 26, 2020 Response from counsel for Defendant proves that both (A) the Representations were false and (B) Defendant never intended to honor the Non-Compete so the representations contained in the Non-Compete were false. [Ex. D].

37.     As both an individual and a substantial shareholder in Company, Defendant had actual knowledge of the materially false and misleading statements and/or material omissions alleged herein and intended thereby to deceive Plaintiff or, in the alternative, acted with reckless disregard for the truth in that he failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to him. Said acts and omissions were committed willfully or with reckless

disregard for the truth. In addition, Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

38.     By reason of the conduct alleged herein, Defendant knowingly or recklessly, directly or indirectly, has violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

39.     As a direct and proximate result of Defendant's wrongful conduct, Plaintiff suffered damages in connection with his purchase of the Securities.

40.     The Rebar Job could generate as much as $6,000,000 in net profits for the Competing Business.

41.     If the Representations were not false and the representations contained in the Non-Compete were not false, Company might have obtained all or part of the Rebar Job and generated as much as $6,000,000 in net profits for Company.

42.     Under the Investment Contract, Plaintiff is entitled to receive 40% of net profits of Company.

43.     The $6,000,000 in net profits for Company from the Rebar Job would have greatly increased the value of the Securities.

44.     Plaintiff is entitled to recover as damages his $200,000 investment plus his $40,000 premium and additionally, as damages, an amount to be proven at trial but no less than $300,000 related to the Rebar Job. Additionally, demands his costs of suit and interest.

**CLAIM 2 - Violations of Section 20(a) of the Exchange Act**

45.     Plaintiff incorporates by reference the allegations of paragraphs 1 through 44 inclusive, as though fully set forth herein.

46.     Defendant participated in the operation and management of Company, and conducted and participated, directly and indirectly, in the conduct of its business affairs. As such, Defendant was a "controlling person" of Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, Defendant participated in the unlawful conduct alleged.

47.     Because of Defendant's positions of authority and control, Defendant knew the material adverse undisclosed information about Company including those misstatements described herein. Defendant had a duty to disseminate accurate and truthful information to Plaintiff with respect to Company's activities and the use of Plaintiff's money, and to correct promptly any materially false statements that Defendant made to Plaintiff.

48.     By reason of the above conduct, Defendant is liable to Plaintiff pursuant to Section 20(a) of the Exchange Act for the violations committed by Company.

49.     Plaintiff is entitled to recover as damages his $200,000 investment plus his $40,000 premium and additionally, as damages, an amount to be proven at trial but no less than $300,000 related to the Rebar Job. Additionally, demands his costs of suit and interest.

**CLAIM 3 – Fraud in the Inducement**

50.     Plaintiff incorporates by reference the allegations of paragraphs 1 through 49 inclusive, as though fully set forth herein.

51.     Defendant made the Representations to Plaintiff prior to Plaintiff entering into the Investment Contract.

52.     The integration clause in the Investment Contract only applies to executed agreements [written] and does not apply to the Representations which were oral. [Ex. A, p. 2].

53.     The Representations concerned material facts.

54.     The Representations were false as stated *supra*.

55.     Defendant knew the Representations to be false at the time that Defendant made the Representations to Plaintiff.

56.     The Representations were made by Defendant to Plaintiff with the intent to induce reliance and forbearance from further inquiry by Plaintiff.

57.     Plaintiff justifiably relied upon the Representations and invested $200,000 into Company in return for Securities.

58.     Counsel for Defendant asserts in the Response that the Non-Compete is "completely unenforceable". [Ex. D].

59.     The false Representations by Defendant have directly caused Plaintiff to suffer damages in the amount of his $200,000 investment plus his $40,000 premium and additionally, as damages, an amount to be proven at trial but no less than $300,000 related to the Rebar Job. Additionally, demands his attorney's fees, costs of suit and interest.

**CLAIM 4 – Breach of Contract**

60.     Plaintiff incorporates by reference the allegations of paragraphs 1 through 59 inclusive, as though fully set forth herein.

61.     Plaintiff and Defendant formed a contract by executing the Investment Contract dated November 19, 2019.

62.     Plaintiff has fully performed under the Investment Contract by investing $200,000 into the Company.

63.     Defendant has breached the Investment Contract by failing to perform in accordance with the terms of the Non-Compete.

64.     The breach by Defendant has directly caused Plaintiff to suffer damages in the amount of his $200,000 investment plus his $40,000 premium and additionally, as damages, an

amount to be proven at trial but no less than $300,000 related to the Rebar Job. Additionally, demands his costs of suit and interest.

**CLAIM 5 – Breach of Fiduciary Duty / Corporate Opportunity Doctrine**

65.    Plaintiff incorporates by reference the allegations of paragraphs 1 through 64 inclusive, as though fully set forth herein.

66.    Plaintiff was and is an intended beneficiary under the Shareholder Agreement.

67.    Defendant was a corporate fiduciary to both Company and Plaintiff.

68.    Defendant owed fiduciary duties to both Company and Plaintiff.

69.    Upon information and belief, Defendant diverted, or helped divert, the Rebar Job, an asset of Company, to the Competing Business and such diversion was for Defendant's own benefit which was a breach of the duties owed to both Company and Plaintiff.

70.    If Company had obtained all or part of the Rebar Job, it could have generated as much as $6,000,000 in net profits for Company.

71.    Under the Investment Contract, Plaintiff is entitled to receive 40% of net profits of Company.

72.    Plaintiff is entitled to recover as damages an amount to be proven at trial but no less than $300,000 related to the Rebar Job. Additionally, demands his costs of suit and interest.

## PRAYER

WHEREFORE, Plaintiff prays for the following from Defendant:

A.    Damages to be proven at trial but no less than $540,000.

B.    Plaintiff's attorney's fees, costs of suit and interest.

C.    Such other and further relief that this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all Claims at law plead herein.

June 8, 2020                                      Respectfully submitted,


/s/ Raymond J. Markovich
Raymond J. Markovich, Esq. (RM0919)
Chief Counsel
J - Bar Reinforcement Inc.
421 E. 119th Street
New York, NY 10035
Tel: 323-401-8032
rjmarkovich@me.com
*Attorney for Plaintiff*

# EXHIBIT A

## Memorandum of Understanding

### Agreement of and Between the Shareholders of Beyond Steel, Inc. & Raymond Bouderau

### Dated: November 19, 2019

### Purpose

The purpose of this document is to memorialize the understanding of the current common equity shareholders of Beyond Steel, Inc., namely Kyle Balakitsis and Duncan McCarthy (hereinafter "Shareholders") and Mr. Raymond Bouderau.

### Background

Based on the Shareholder's Agreement of Beyond Steel, Inc., the current common equity structure of the voting shares of the company are as follows:

1. Kyle Balakitsis – 51%
2. Duncan McCarthy – 49%

While the voting equity of the company consists currently of one class of common stock, it has been agreed and understood by the two aforementioned shareholders of Beyond Steel, Inc. (hereinafter the "Company") that their voting shares do not and will not represent their share of the company profit as will be discussed in the following section(s).

### Agreement

The specific terms of this Agreement are as follows:

1. As it is acknowledged and agreed, Mr. Raymond Bouderau will be contributing the company's initial capital and may from time to time contribute further capital, Mr. Raymond Bouderau will receive forty percent (40%) of all net profit that is generated by the company.
2. Mr. Bouderau will be repaid his initial and any further capital investments into the company before any other capital can be disbursed to any other shareholder or party to this agreement which includes all other debts, accounts payable, salaries, or any other payments that are due from the Company other than those that are required to be paid by the laws of the State of New York and the United States.
3. For his capital contribution both already given and any any further capital he contributes in the furture, the Company through its Shareholders agrees to pay Mr. Bouderau a twenty percent (20%) premium on his total contributions which is to be paid out in the same fashion as the total contribution Mr. Bouderau has made giving this the same first priority of payment as the initial capital contribution both already given and to be contributed in the future.
4. Once Mr. Bouderau's contribution and premium are repaid by the company, the following schedule shall be followed when the Company is disbursing its net profits from operations:
   a. Mr. Raymond Bouderau – 40%
   b. Mr. Kyle Balakitsis – 30%
   c. Mr. Duncan McCarthy – 30%
5. **Non-Compete**. Shareholders acknowledge and recognize the highly competitive nature of the Company's business and that Shareholders duties hereunder justify restricting Shareholders further employment or ownership interest in a like company following any termination of Shareholdings in the Company or active participation in the company. The Shareholders agree that so long as the Shareholders are actively participating in the Company, and (i) for a period of

five years following the termination of this Agreement, Shareholders, except when acting at the request of the Company on behalf of or for the benefit of the Company, will not induce customers, agents or other sources of distribution of the Company's business under contract or doing business with the Company to terminate, reduce, alter or divert business with or from the Company, and (ii) for a period of five years following the termination of Shareholder's interest in the Company or the termination of this Agreement, Shareholders shall not, directly or indirectly, either as a principal, agent, employee, employer, consultant, partner, member or manager of a limited liability company or, shareholder of a company, engage or otherwise participate in any manner or fashion in any business that is in competition in any manner whatsoever with the business activities of the Company, in or around any market in which the Company has, or has publicly announced a plan for doing business. Shareholders further covenant and agree that the restrictive covenant set forth in this paragraph is reasonable as to duration, terms, and geographical area and that the same protects the legitimate interests of the Company, imposes no undue hardships on Shareholders, and is not injurious to the public. It is the desire and intent of the Parties that the provisions of this paragraph be enforced to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which the company operates. This non-compete clause shall cover a geographical area of 50 miles from all places where the Company operates.

6.  Once executed, this memorandum of understanding and agreement shall supersede any prior executed agreements and shall remain in full effect throughout the Company's existence or until a newly executed agreement is made where all parties to this agreement are parties to the newly created agreement.

7.  For a new agreement to take effect to supersede the terms of the subject agreement, all parties must execute the newly formed agreement.

AGREED to and SIGNED on the ___19th___ Day of November, 2019

_____
Raymond Boudreau

_____
Kyle Balakitsis

_____
Duncan McCarthy

# EXHIBIT B

# SHAREHOLDER AGREEMENT
# OF
# BEYOND STEEL, INC.

FORMED IN THE STATE OF NEW YORK

This Agreement, entered into on November 19, 2019, is an

SHAREHOLDER AGREEMENT, entered into by and between

KYLE BALAKITSIS of 1213 Route 17A, Greenwood Lake, New York, 10925,

DUNCAN McCARTHY, of 9 Holiday Lane, Sterling Forest, New York 10979,

hereinafter known as the "Shareholders"

WHEREAS the Shareholders desire to create a company under the laws of the State of New York and set forth the terms herein of the Company's operation and the relationship between Shareholders.

NOW, THEREFORE, in consideration of the mutual covenants set forth herein and other valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the Shareholders and the Company agree as follows:

## 1.  Name and Principal Place of Business

The name of the Company shall be BEYOND STEEL, INC.  The principal place of business of the Company shall be at Orange County, in the State of New York or at such other place of business as the Shareholder(s) shall determine.

## 2.  Formation

The Company was formed on November 9, 2018, when the Shareholders filed the Articles of Incorporation with the office of the Secretary of State pursuant to the statutes governing corporations in the State of New York (the "Statutes").

## 3.  Purpose

The purpose of the Company is to engage in and conduct any and all lawful businesses, activities or functions, and to carry on any other lawful activities in connection with or incidental to the foregoing, as the Shareholders in their discretion shall determine.

*DMcC*

## 4.  Term

The term of the Company shall be perpetual, commencing on the filing of the Articles of Incorporation of the Company, and continuing until terminated under the provisions set forth herein.

## 5.  Shareholder Capital Contributions

Each Shareholder has contributed the following capital amounts to the Company as set forth below and are not obligated to make any additional capital contributions:

_____         $_____

_____         $_____

_____         $_____

Shareholders shall have no right to withdraw or reduce their contributions to the capital of the Company until the Company has been terminated unless otherwise set forth herein.  Shareholders shall have no right to demand and receive any distribution from the Company in any form other than cash and Shareholders shall not be entitled to interest on their capital contributions to the Company.

The liability of any Shareholder for the losses, debts, liabilities and obligations of the Company shall be limited to the amount of the capital contribution of each Shareholder plus any distributions paid to such Shareholder, such Shareholder's share of any undistributed assets of the Company; and (only to the extent as might be required by applicable law) any amounts previously distributed to such Shareholder by the Company.

## 6.  Distributions

For purposes of this Agreement "net profits" and "net losses" mean the profits or losses of the Company resulting from the conduct of the Company's business, after all expenses, including depreciation allowance, incurred in connection with the conduct of its business for which such expenses have been accounted.

The term "cash receipts" shall mean all cash receipts of the Company from whatever source derived, including without limitation capital contributions made by the Shareholder(s); the proceeds of any sale, exchange, condemnation or other disposition of all or any part of the assets of the Company; the proceeds of any loan to the Company; the proceeds of any mortgage or refinancing of any mortgage on all or any part of the assets of the Company; the proceeds of any insurance policy for fire or other casualty damage payable to the Company; and the proceeds from the liquidation of assets of the Company following termination.

Shareholder Agreement Beyond Steel, Inc.

The term "capital transactions" shall mean any of the following: the sale of all or any part of the assets of the Company; the refinancing of mortgages or other liabilities of the Company; the receipt of insurance proceeds; and any other receipts or proceeds are attributable to capital.

The term "Shareholders' Percentage Interests" shall mean the percentages set forth opposite the name of each Shareholder Below:

| Shareholder | Percentage Interest | |
|---|---|---|
| KYLE BALAKITSIS | 51 | % |
| DUNCAN McCARTHY | 49 | % |

The cash receipts of the Company shall be applied in the following order of priority: (a) to the payment of interest or amortization on any mortgages on the assets of the Company, amounts due on debts and liabilities of the Company other than those due to any Shareholder, costs of the construction of the improvements to the assets of the Company and operating expenses of the Company; (b) to the payment of interest and establishment of cash reserves determined by the Shareholders to be necessary or appropriate, including without limitation, reserves for the operation of the Company's business, construction, repairs, replacements, taxes and contingencies; and (d) to the repayment of any loans made to the Company by any Shareholder. Thereafter, the cash receipts of the Company shall be distributed among the Shareholders as hereafter provided.

Except as otherwise provided in this Agreement or otherwise required by law, distributions of cash receipts of the Company, other than from capital transactions, shall be allocated among the Shareholders in proportion to the Shareholders' Percentage Interests.

Except as otherwise provided in this Agreement or otherwise required by law, distributions of cash receipts from capital transactions shall be allocated in the following order or priority: (a) to the Shareholders in proportion to their respective capital accounts until each Shareholder has received cash distributions equal to any positive balance in their capital account; then (b) to the Shareholders in proportion to the Shareholders' Percentage Interests.

7.   Books, Records and Tax Returns

The Shareholders, or their designees, shall maintain complete and accurate records and books of the Company's transactions in accordance with generally accepted accounting principles.

The Company shall furnish each Shareholder, within seventy-five days after the end of each fiscal year, an annual report of the Company including a balance sheet, a profit and loss statement; and the amount of such Shareholder's share of the Company's income, gain, losses, deductions and other relevant items for federal income tax purposes where applicable.

The Company shall prepare all Federal, State and local income tax and information returns for the Company and shall cause such tax and information returns to be timely filed.  Within seventy-five days after the end of each fiscal year, the Company shall forward to each person

Shareholder Agreement Beyond Steel, Inc.

who was a Shareholder during the preceding fiscal year a true copy of the Company's Form K-1 filed with the Internal Revenue Service for the preceding fiscal year.

Upon request, the Company shall furnish to each Shareholder, a current list of the names and addresses of all the Shareholders of the Company, and any other persons or entities having any financial interest in the Company.

## 8.   Bank Accounts

All funds of the Company shall be deposited in the Company's name in a bank account or accounts as chosen by the Shareholders.  Withdrawals from any bank accounts shall be made only in the regular course of business of the Company and shall be made upon such signature or signatures as the Shareholders from time to time may designate.

The authority to sign checks on behalf of the company shall reside in both Shareholders listed above individually (namely Kyle Balakitsis and Duncan McCarthy together).

## 9.   Management of the Company

The business and affairs of the Company shall be conducted and managed by the Shareholders in accordance with this Agreement and the laws of the State of New York.

Except as expressly provided elsewhere in this Agreement, all decisions respecting the management, operation and control of the business and affairs of the Company and all determinations made in accordance with this Agreement shall be made by the affirmative vote or consent of Shareholders holding a majority of the Shareholders' Percentage Interests.

Notwithstanding any other provision of this Agreement, the Shareholders shall not, without the prior written consent of the unanimous vote or consent of the Shareholders, sell, exchange, lease, assign or otherwise transfer all or substantially all of the assets of the Company; sell, exchange, lease (other than space leases in the ordinary course of business), assign or transfer the Company's assets; mortgage, pledge or encumber the Company's assets other than is expressly authorized by this Agreement; prepay, refinance, modify, extend or consolidate any existing mortgages or encumbrances; borrow money on behalf of the Company; lend any Company funds or other assets to any person; establish any reserves for working capital repairs, replacements, improvements or any other purpose; confess a judgment against the Company; settle, compromise or release, discharge or pay any claim, demand or debt, including claims for insurance; approve a merger or consolidation of the Company with or into any other limited liability company, corporation, partnership or other entity; or change the nature or character of the business of the Company.

The Shareholders shall receive such sums as distributions as Shareholders of the Company as may be determined from time to time by the affirmative vote or consent of Shareholders holding a majority of the Shareholders' Percentage Interests.

Shareholder Agreement Beyond Steel, Inc.

## 10. Meetings of Shareholders

The annual meeting of the Shareholders shall be held annually on a generally convenient date and time at the principal office of the Company or at such other time and place as the Shareholders determine, for the purpose of transacting such business as may lawfully come before the meeting. If the day fixed for the annual meeting shall be a legal holiday, such meeting shall be held on the next succeeding business day.

The Shareholders may by resolution prescribe the time and place for the holding of regular meetings and may provide that the adoption of such resolution shall constitute notice of such regular meetings.

Special meetings of the Shareholders, for any purpose or purposes, may be called by any 1 Shareholder (or such other number of Shareholders as the Shareholders from time to time may specify).

Written or electronic notice stating the place, day and hour of the meeting and, in the case of a special meeting, the purpose for which the meeting is called, shall be delivered not less than three days before the date of the meeting, either personally or by mail, to each Shareholder of record entitled to vote at such meeting. When all the Shareholders of the Company are present at any meeting, or if those not present sign a written waiver of notice of such meeting, or subsequently ratify all the proceedings thereof, the transactions of such meeting shall be valid as if a meeting had been formally called and notice had been given.

At any meeting of the Shareholders, the presence of Shareholders holding a majority of the Shareholders' Percentage Interests, as determined from the books of the Company, represented in person or by proxy, shall constitute a quorum for the conduct of the general business of the Company. However, if any particular action by the Company shall require the vote or consent of some other number or percentage of Shareholders pursuant to this Agreement, a quorum for the purpose of taking such action shall require such other number or percentage of Shareholders. If a quorum is not present, the meeting may be adjourned from time to time without further notice, and if a quorum is present at the adjourned meeting any business may be transacted which might have been transacted at the meeting as originally notified. The Shareholders present at a duly organized meeting may continue to transact business until adjournment, notwithstanding the withdrawal of enough Shareholders to leave less a quorum.

At all meetings of the Shareholders, a Shareholder may vote by proxy executed in writing by the Shareholder or by a duly authorized attorney-in-fact of the Shareholder. Such proxy shall be filed with the Company before or at the time of the meeting.

A Shareholder of the Company who is present at a meeting of the Shareholders at which action on any matter is taken shall be presumed to have assented to the action taken, unless the dissent of such Shareholder shall be entered in the minutes of the meeting or unless such Shareholder shall file a written dissent to such action with the person acting as the secretary of the meeting before the meeting's adjournment. Such right to dissent shall not apply to a Shareholder who voted in favor of such action.

*D.McC*

5 | P a g e

Shareholder Agreement Beyond Steel, Inc.

Unless otherwise provided by law, any action required to be taken at a meeting of the Shareholders, or any other action which may be taken at a meeting of the Shareholders, may be taken without a meeting if a consent in writing, setting forth the action so taken, shall be signed by all of the Shareholders entitled to vote with respect to the subject.

Shareholders of the Company may participate in any meeting of the Shareholders by means of conference telephone or similar communication if all persons participating in such meeting can hear one another for the entire discussion of the matters to be vote upon.  Participation in a meeting pursuant to this paragraph shall constitute presence in person at such meeting.

## 11. Assignment of Interests

Except as otherwise provided in this Agreement, no Shareholder or other person holding any interest in the Company may assign, pledge, hypothecate, transfer or otherwise dispose of all or any part of their interest in the Company, including without limitation, the capital, profits or distributions of the Company without the prior written consent of the other Shareholders in each instance.

The Shareholders agree that no Shareholder may voluntarily withdraw from the Company without the unanimous vote or consent of the Shareholders.

A Shareholder may assign all or any part of such Shareholder's interest in the allocations and distributions of the Company to any of the following (collectively the "permitted assignees"): any person, corporation, partnership or other entity as to which the Company has given consent to the assignment of such interest in the allocations and distributions of the Company by the affirmative vote or consent of Shareholders holding a majority of the Shareholders' Percentage Interests.  An assignment to a permitted assignee shall only entitle the permitted assignee to the allocations and distributions to which the assigned interest is entitled, unless such permitted assignee applies for admission to the Company and is admitted to the Company as a Shareholder in accordance with this Agreement.

An assignment, pledge, hypothecation, transfer or other disposition of all or any part of the interest of a Shareholder in the Company or other person holding any interest in the Company in violation of the provisions hereof shall be null and void for all purposes.

No assignment, transfer or other disposition of all or any part of the interest of any Shareholder permitted under this Agreement shall be binding upon the Company unless and until a duly executed and acknowledged counterpart of such assignment or instrument of transfer, in form and substance satisfactory to the Company, has been delivered to the Company.

No interest in the Company may be assigned or given to any person below the age of 21 years or to a person who has been adjudged to be insane or incompetent.



Shareholder Agreement Beyond Steel, Inc.

Anything herein contained to the contrary, the Company shall be entitled to treat the record holder of the interest of a Shareholder as the absolute owner thereof, and shall incur no liability by reason of distributions made in good faith to such record holder, unless and until there has been delivered to the Company the assignment or other instrument of transfer and such other evidence as may be reasonably required by the Company to establish to the satisfaction of the Company that an interest has been assigned or transferred in accordance with this Agreement.

## 12. Right of First Refusal

If a Shareholder desires to sell, transfer or otherwise dispose of all or any part of their interest in the Company, such Shareholder (the "Selling Shareholder") shall first offer to sell and convey such interest to the other Shareholders before selling, transferring or otherwise disposing of such interest to any other person, corporation or other entity. Such offer shall be in writing, shall be given to every other Shareholder, and shall set forth the interest to be sold, the purchase price to be paid, the date on which the closing is to take place (which date shall be not less than thirty nor more than sixty days after the delivery of the offer), the location at which the closing is to take place, and all other material terms and conditions of the sale, transfer or other disposition.

Within fifteen days after the delivery of said offer the other Shareholders shall deliver to the Selling Shareholder a written notice either accepting or rejecting the offer. Failure to deliver said notice within said fifteen days conclusively shall be deemed a rejection of the offer. Any or all of the other Shareholders may elect to accept the offer, and if more than one of the other Shareholders elects to accept the offer, the interest being sold and the purchase price therefore shall be allocated among the Shareholders so accepting the offer in proportion to their Shareholders' Percentage Interests, unless they otherwise agree in writing.

If any or all of the other Shareholders elect to accept the offer, then the closing of title shall be held in accordance with the offer and the Selling Shareholder shall deliver to the other Shareholders who have accepted the offer an assignment of the interest being sold by the Selling Shareholder, and said other Shareholders shall pay the purchase price prescribed in the offer.

If no other Shareholder accepts the offer, or if the Shareholders who have accepted such offer default in their obligations to purchase the interest, then the Selling Shareholder within 120 days after the delivery of the offer may sell such interest to any other person or entity at a purchase price which is not less than the purchase price prescribed in the offer and upon the terms and conditions which are substantially the same as the terms and conditions set forth in the offer, provided all other applicable requirements of this Agreement are complied with. An assignment of such interest to a person or entity who is not a Shareholder of the Company shall only entitle such person or entity to the allocations and distributions to which the assigned interest is entitled, unless such person or entity applies for admission to the Company and is admitted to the Company as a Shareholder in accordance with this Agreement.

If the Selling Shareholder does not sell such interest within said 120 days, then the Selling Shareholder may not thereafter sell such interest without again offering such interest to the other Shareholders in accordance with this Agreement.

Shareholder Agreement Beyond Steel, Inc.

## 13. Admission of New Shareholders

The Company may admit new Shareholders (or transferees of any interests of existing Shareholders) into the Company by the unanimous vote or consent of the Shareholders.

As a condition to the admission of a new Shareholder, such Shareholder shall execute and acknowledge such instruments, in form and substance satisfactory to the Company, as the Company may deem necessary or desirable to effectuate such admission and to confirm the agreement of such Shareholder to be bound by all of the terms, covenants and conditions of this Agreement, as the same may have been amended. Such new Shareholder shall pay all reasonable expenses in connection with such admission, including without limitation, reasonable attorneys' fees and the cost of the preparation, filing or publication of any amendment to this Agreement or the Articles of Incorporation, which the Company may deem necessary or desirable in connection with such admission.

No new Shareholder shall be entitled to any retroactive allocation of income, losses, or expense deductions of the Company. The Company may make pro rata allocations of income, losses or expense deductions to a new Shareholder for that portion of the tax year in which the Shareholder was admitted.

In no event shall a new Shareholder be admitted to the Company if such admission would be in violation of applicable Federal or State securities laws or would adversely affect the treatment of the Company as a subchapter S Corporation for income tax purposes.

## 14. Withdrawal Events

In the event of the death, retirement, withdrawal, expulsion, or dissolution of a Shareholder, or an event of bankruptcy or insolvency, as hereinafter defined, with respect to a Shareholder, or the occurrence of any other event which terminates the continued shareholding of a Shareholder in the Company pursuant to the Statutes (each of the foregoing being hereinafter referred to as a "Withdrawal Event"), the Company shall terminate sixty days after notice to the Shareholders of such withdrawal Event unless the business of the Company is continued as hereinafter provided.

Notwithstanding a Withdrawal Event with respect to a Shareholder, the Company shall not terminate, irrespective of applicable law, if within aforesaid sixty day period the remaining Shareholders, by the unanimous vote or consent of the Shareholders (other than the Shareholder who caused the Withdrawal Event), shall elect to continue the business of the Company.

In the event of a Withdrawal Event with respect to a Shareholder, any successor in interest to such Shareholder (including without limitation any executor, administrator, heir, committee, guardian, or other representative or successor) shall not become entitled to any rights or interests of such Shareholder in the Company, other than the allocations and distributions to which such Shareholder is entitled, unless such successor in interest is admitted as a Shareholder in accordance with this Agreement.

*D McC*

Shareholder Agreement Beyond Steel, Inc.

An "event of bankruptcy or insolvency" with respect to a Shareholder shall occur if such Shareholder: (1) applies for or consents to the appointment of a receiver, trustee or liquidator of all or a substantial part of their assets; or (2) makes a general assignment for the benefit of creditors; or (3) is adjudicated a bankrupt or an insolvent; or (4) files a voluntary petition in bankruptcy or a petition or an answer seeking an arrangement with creditors or to take advantage of any bankruptcy, insolvency, readjustment of debt or similar law or statute, or an answer admitting the material allegations of a petition filed against them in any bankruptcy, insolvency, readjustment of debt or similar proceedings; or (5) takes any action for the purpose of effecting any of the foregoing; or (6) an order, judgment or decree shall be entered, with or without the application, approval or consent of such Shareholder, by any court of competent jurisdiction, approving a petition for or appointing a receiver or trustee of all or a substantial part of the assets of such Shareholder, and such order, judgment or decree shall be entered, with or without the application, approval or consent of such Shareholder, by any court of competent jurisdiction, approving a petition for or appointing a receiver or trustee of all or a substantial part of the assets of such Shareholder, and such order, judgment or decree shall continue unstayed and in effect for thirty days.

## 15. Dissolution and Liquidation

The Company shall terminate upon the occurrence of any of the following : (i) the election by the Shareholders to dissolve the Company made by the unanimous vote or consent of the Shareholders; (ii) the occurrence of a Withdrawal Event with respect to a Shareholder and the failure of the remaining Shareholders to elect to continue the business of the Company as provided for in this Agreement above; or (iii) any other event which pursuant to this Agreement, as the same may hereafter be amended, shall cause a termination of the Company.

The liquidation of the Company shall be conducted and supervised by a person designated for such purposes by the affirmative vote or consent of Shareholders holding a majority of the Shareholders' Percentage Interests (the "Liquidating Agent"). The Liquidating Agent hereby is authorized and empowered to execute any and all documents and to take any and all actions necessary or desirable to effectuate the dissolution and liquidation of the Company in accordance with this Agreement.

Promptly after the termination of the Company, the Liquidating Agent shall cause to be prepared and furnished to the Shareholders a statement setting forth the assets and liabilities of the Company as of the date of termination. The Liquidating Agent, to the extent practicable, shall liquidate the assets of the Company as promptly as possible, but in an orderly and businesslike manner so as not to involve undue sacrifice.

The proceeds of sale and all other assets of the Company shall be applied and distributed in the following order of priority: (1) to the payment of the expenses of liquidation and the debts and liabilities of the Company, other than debts and liabilities to Shareholders; (2) to the payment of debts and liabilities to Shareholders; (3) to the setting up of any reserves which the Liquidating Agent may deem necessary or desirable for any contingent or unforeseen liabilities or obligations of the Company, which reserves shall be paid over to licensed attorney to hold in escrow for a

Shareholder Agreement Beyond Steel, Inc.

period of two years for the purpose of payment of any liabilities and obligations, at the expiration of which period the balance of such reserves shall be distributed as provided; (4) to the Shareholders in proportion to their respective equity holdings.

Upon compliance with the distribution plan, the Shareholders shall no longer be Shareholders, and the Company shall execute, acknowledge and cause to be filed any documents or instruments as may be necessary or appropriate to evidence the dissolution and termination of the Company pursuant to the Statutes.

## 16. Representations of Shareholders

Each of the Shareholders represents, warrants and agrees that the Shareholder is acquiring the interest in the Company for the Shareholder's own account for investment purposes only and not with a view to the sale or distribution thereof; the Shareholder, if an individual, is over the age of 21; if the Shareholder is an organization, such organization is duly organized, validly existing and in good standing under the laws of its State of organization and that it has full power and authority to execute this Agreement and perform its obligations hereunder; the execution and performance of this Agreement by the Shareholder does not conflict with, and will not result in any breach of, any law or any order, writ, injunction or decree of any court or governmental authority against or which binds the Shareholder, or of any agreement or instrument to which the Shareholder is a party; and the Shareholder shall not dispose of such interest or any part thereof in any manner which would constitute a violation of the Securities Act of 1933, the Rules and Regulations of the Securities and Exchange Commission, or any applicable laws, rules or regulations of any State or other governmental authorities, as the same may be amended.

## 17. Certificates Evidencing Shareholder Interest

Every Shareholder interest in the Company shall be evidenced by a Certificate issued by the Company. Each Certificate shall set forth the name of the Shareholder holding the share interest and the Shareholder's Percentage Interest held by the Shareholder.

## 18. Notices

All notices, demands, requests or other communications which any of the parties to this Agreement may desire or be required to give hereunder shall be in writing and shall be deemed to have been properly given if sent by courier or by registered or certified mail, return receipt requested, with postage prepaid, addressed as follows: (a) if to the Company, at the principal place of business of the Company designated by the Company; and (b) if to any Shareholder, to the address of said Shareholder first above written, or to such other address as may be designated by said Shareholder by notice to the Company and the other Shareholders pursuant to this Article 13.

## 19. Arbitration

*DMcC*

Shareholder Agreement Beyond Steel, Inc.

Any dispute, controversy or claim arising out of or in connection with this Agreement or any breach or alleged breach hereof shall, upon the request of any party involved, be submitted to, and settled by, arbitration in the State in which the principal place of business of the Company is then located, pursuant to the commercial arbitration rules then in effect of the American Arbitration Association (or at any other time or place or under any other form of arbitration mutually acceptable to the parties involved). Any award rendered shall be final and conclusive upon the parties and a judgment thereon may be entered in a court of competent jurisdiction. The expenses of the arbitration shall be borne equally by the parties to the arbitration, provided that each party shall pay for and bear the cost of its own experts, evidence and attorneys' fees, except that in the discretion of the arbitrator any award may include the attorney's fees of a party if the arbitrator expressly determines that the party against whom such award is entered has caused the dispute, controversy or claim to be submitted to arbitration as a dilatory tactic or in bad faith.

## 20. Amendments

This Agreement may not be altered, amended, changed, supplemented, waived or modified in any respect or particular unless the same shall be in writing and agreed to by the affirmative vote or consent of Shareholders holding a majority of the Shareholders' Percentage Interests. No amendment may be made to Articles that apply to the financial interest of the Shareholders, except by the vote or consent of all of the Shareholders. No amendment of any provision of this Agreement relating to the voting requirements of the Shareholders on any specific subject shall be made without the affirmative vote or consent of at least the number or percentage of Shareholders required to vote on such subject.

## 21. Indemnification

a) The Shareholders (including, for purposes of this Section, any estate, heir, personal representative, receiver, trustee, successor, assignee and/or transferee of the Shareholders) shall not be liable, responsible or accountable, in damages or otherwise, to the Company or any other person for: (i) any act performed, or the omission to perform any act, within the scope of the power and authority conferred on the Shareholders by this agreement and/or by the statute except by reason of acts or omissions found by a court of competent jurisdiction upon entry of a final judgment rendered and un-appealable or not timely appealed ("Judicially Determined") to constitute fraud, gross negligence, recklessness or intentional misconduct; (ii) the termination of the Company and this Agreement pursuant to the terms hereof; (iii) the performance by the Shareholder of, or the omission by the Shareholders to perform, any act which the Shareholders reasonably believe to be consistent with the advice of attorneys, accountants or other professional advisers to the Company with respect to matters relating to the Company, including actions or omissions determined to constitute violations of law but which were not undertaken in bad faith; or (iv) the conduct of any person selected or engaged by the Shareholders.

Shareholder Agreement Beyond Steel, Inc.

The Company, its receivers, trustees, successors, assignees and/or transferees shall indemnify, defend and hold the Shareholders harmless from and against any and all liabilities, damages, losses, costs and expenses of any nature whatsoever, known or unknown, liquidated or unliquidated, that are incurred by the Shareholders (including amounts paid in satisfaction of judgments, in settlement of any action, suit, demand, investigation, claim or proceeding ("Claim"), as fines or penalties) and from and against all legal or other such costs as well as the expenses of investigating or defending against any Claim or threatened or anticipated Claim arising out of, connected with or relating to this Agreement, the Company or its business affairs in any way; provided, that the conduct of the Shareholders which gave rise to the action against the Shareholders is indemnifiable under the standards set forth herein.

Upon application to Company, the Shareholders shall be entitled to receive advances to cover the costs of defending or settling any Claim or any threatened or anticipated Claim against the Shareholders that may be subject to indemnification hereunder. The Shareholder(s) are required to submit a receipt(s) accounting for the cost of defending such action that the Company is required to indemnify said Shareholder(s).

If a Court of competent jurisdiction determines that the Shareholder(s) do not have the right to indemnification by the Company for any Claim, any advances or reimbursement payment that the Company may have made to the Shareholder(s) must be repaid to the Company by the Shareholder(s).

All rights of the Shareholders to indemnification under this Agreement shall (i) be cumulative of, and in addition to, any right to which the Shareholders may be entitled to by contract or as a matter of law or equity, and (ii) survive the dissolution, liquidation or termination of the Company as well as the death, removal, incompetency or insolvency any of the Shareholders.

The termination of any Claim or threatened Claim against the Shareholders by judgment, order, settlement or upon a plea of *nolo contendere* or its equivalent shall not, of itself, cause the Shareholders not to be entitled to indemnification as provided herein unless and until Judicially Determined to not be so entitled.

## 22. Miscellaneous

This Agreement and the rights and liabilities of the parties hereunder shall be governed by and determined in accordance with the laws of the State of New York. If any provision of this Agreement shall be invalid or unenforceable, such invalidity or unenforceability shall not affect the other provisions of this Agreement, which shall remain in full force and effect.

Shareholder Agreement Beyond Steel, Inc.

The captions in this Agreement are for convenience only and are not to be considered in construing this Agreement. All pronouns shall be deemed to be the masculine, feminine, neuter, singular or plural as the identity of the person or persons may require. References to a person or persons shall include partnerships, corporations, limited liability companies, unincorporated associations, trusts, estates and other types of entities.

This Agreement, and any amendments hereto may be executed in counterparts all of which taken together shall constitute one agreement.

This Agreement sets forth the entire agreement of the parties hereto with respect to the subject matter hereof. It is the intention of the Shareholder(s) that this Agreement shall be the sole agreement of the parties, and, except to the extent a provision of this Agreement provides for the incorporation of federal income tax rules or is expressly prohibited or ineffective under the Statutes, this Agreement shall govern even when inconsistent with, or different from, the provisions of any applicable law or rule. To the extent any provision of this Agreement is prohibited or otherwise ineffective under the Statutes, such provision shall be considered to be ineffective to the smallest degree possible in order to make this Agreement effective under the Statutes.

Subject to the limitations on transferability set forth above, this Agreement shall be binding upon and inure to the benefit of the parties hereto and to their respective heirs, executors, administrators, successors and assigns.

No provision of this Agreement is intended to be for the benefit of or enforceable by any third party.

**IN WITNESS WHEREOF**, the parties have executed this Agreement this _19th_ day of November, 2019.

BEYOND STEEL, INC.

By: _____        _____
     KYLE BALAKITSIS                        DUNCAN McCARTHY

**EXHIBIT C**



**U.S. LAW GROUP**

| LOS ANGELES | NEW YORK |
|---|---|
| 427 N. CANON DRIVE | 30 WALL STREET |
| SUITE 206 | 8TH FLOOR |
| BEVERLY HILLS, CA 90210 | NEW YORK, NY 10005 |
| T. 877.821.8718 | T. 212.634.4545 |
| F. 310.870.7063 | F. 212.634.4546 |

February 12, 2020

*Via Email*

Mr. Duncan McCarthy
Dmccarthy1379@gmail.com

Dear Mr. McCarthy:

Our firm represents Mr. Raymond Bouderau and I am also Chief Counsel for his companies. We write to you concerning the Agreement between the shareholders of Beyond Steel, Inc. ("Company") and Mr. Bouderau dated November 19, 2019 ("Agreement").

It has come to our attention that you are in material breach of Section 5 of the Agreement. As a result of such breach, Mr. Bouderau demands that he immediately be repaid his capital contribution of $200,000 plus the contractual premium of $40,000 for a total amount due and payable of $240,000.

If we do not receive a response from you within 10 days, we will pursue all legal remedies to enforce Mr. Bouderau's rights under the Agreement.

All rights reserved.

Sincerely,

Raymond J. Markovich, Esq.
ray@uslawgroupinc.com
\* *BBA, JD & LLM - admitted in New York, SCOTUS, 2d, 6th & 9th Circuits*

cc:   Mr. Raymond Bouderau
      Mr. Michael Breslin, Esq.

# EXHIBIT D



Randy M. Friedberg

7 Times Square | Suite 2900 | New York, NY 10036-6524
Direct 212.714.3079 | Fax 212.631.1241
friedbergr@whiteandwilliams.com | whiteandwilliams.com

February 26, 2020

**VIA EMAIL (ray@uslawgroupinc.com)**

U.S. Law Group
30 Wall Street
8th Floor
New York, NY 10005
Attn: Raymond J. Markovich, Esq.

> Re:   **Agreement of and Between the Shareholders of
>        Beyond Steel, Inc. & Raymond Bouderau**

Dear Mr. Markovich:

This firm is counsel to Duncan McCarthy. Please direct any future correspondence regarding this matter to the undersigned. As stated below, however, we hope that will not be necessary.

Our client has forwarded us your demand letter dated February 12, 2020. While we acknowledge receipt, we completely reject your demands. Your claims and allegations, as well as the agreement upon which you purport to rely, the Memorandum of Understanding dated November 19, 2019 (the "Agreement"), are utterly intelligible.

You have alleged our client has committed a material breach of the noncompete section of the Agreement. We completely deny that he has done so. Moreover, we do not understand what you allege the Agreement even purports to represent. Is it a debt agreement, an equity agreement, a shareholder agreement or something else? How do you believe he has breached it?

Whatever you think it is, the noncompete section is, as you must know, completely unenforceable. Moreover, even if it were enforceable in some way, your client would at best have a claim against the entity Beyond Steel, Inc., not against our client.

You have threatened to pursue Mr. Bourderau's claims. Please consider that very carefully. Our client has no personal liability on any level here and if you pursue this matter any further will take all actions to protect and enforce his rights, including pursuing claims against your client.

---

Delaware | Massachusetts | New Jersey | New York | Pennsylvania | Rhode Island

Raymond J. Markovich, Esq.
February 26, 2020
Page 2

If you believe we are missing information or documentation which we should consider, please send it to us.  If not, we will close our file on this matter.

This letter is not intended nor shall it be construed as an offer for settlement or a waiver or relinquishment of any rights or remedies of our client.

Very truly yours,

WHITE AND WILLIAMS LLP

By: _____

Randy M. Friedberg

RMF:gmd
cc:    Mr. Duncan McCarthy

24210746v.1